**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| IN RE: | |
| SHELDON E. LANDON, | Case No. 19-11005-M |
| Debtor. | Chapter 7 |
| | |
| CHRISTOPHER W. KANAGA and LARAJA & KANAGA, P.C., | |
| Plaintiffs, | |
| v. | Adversary No. 19-01038-M |
| SHELDON E. LANDON, | |
| Defendant. | |

**MEMORANDUM OPINION**

*Some tension necessarily exists between the need for a vigorous and uninhibited press and the legitimate interest in redressing wrongful injury.*[1]

"The legitimate state interest underlying the law of libel is the compensation of individuals for the harm inflicted on them by defamatory falsehood."[2]  As often happens in proceedings brought under the Bankruptcy Code, the state interest in compensating victims can be in direct conflict with the federal policy to "relieve the honest debtor from the weight of oppressive indebtedness, and permit him to start afresh free from the obligations and responsibilities

---

[1] *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342 (1974).

[2] *Id*. at 341.

consequent upon business misfortunes."[3] This is a case where a creditor holds a state court judgment for defamation, based on a jury finding that the debtor made false and defamatory statements that damaged the creditor. Despite the judgment and the jury's findings, the debtor holds firm to her belief, however subjective, that her statements (which she still denies even making) were absolutely true. The issue before the Court is whether, after a trial on the merits where the Court has had the opportunity to observe the credibility and demeanor of the debtor, the debt should be excepted from discharge pursuant to 11 U.S.C. § 523(a)(6) for willful and malicious injury to the creditor.[4] The following findings of fact and conclusions of law are made pursuant to Federal Rule of Bankruptcy Procedure 7052.

## Jurisdiction

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b). Venue is proper pursuant to 28 U.S.C. § 1409.  Reference to the Court of this adversary proceeding is proper pursuant to 28 U.S.C. § 157(a). The decision whether a particular debt is dischargeable is a core proceeding as defined by 28 U.S.C. § 157(b)(2)(I).

## Findings of Fact

As discussed in this Court's prior Memorandum Opinion in this proceeding,[5] creditor Christopher W. Kanaga ("Kanaga") holds a judgment from the Massachusetts Trial Court,

---

[3] *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934) (quoting *Williams v. U.S. Fid. & Guar. Co.*, 236 U.S. 549, 554-55 (1915)).

[4] Unless otherwise noted, all statutory references are to sections of the United States Bankruptcy Code, 11 U.S.C. § 101 et seq.

[5] *Kanaga v. Landon (In re Landon)* ("*Landon I*"), Ch. 7 Case No. 19-11005, Adv. No. 19-01038, 2020 WL 4658284 (Bankr. N.D. Okla. Aug. 11, 2020).  This Memorandum Opinion will draw heavily from *Landon I* for both facts and law.

2

Barnstable Superior Court Department (the "Barnstable Court"), Civil Action No. 1572-00335,

against Sheldon E. Landon ("Defendant") for defamation, based on a 2015 Facebook post (the

"Defamatory Post").[6] After a trial on the merits in that action, a jury found:

> a. "Plaintiff Christopher Kanaga has proved by preponderance of the evidence that [Defendant] published one or more of the following statements of and concerning Mr. Kanaga and that they were false:
> [1] he attempted to pay off [Defendant]'s own lawyers;
> [2] he attempted to pay off judges; and
> [3] he attempted to pay off members of law enforcement, including a police officer from Cohasset."
>
> b. "[Defendant] published the false and defamatory statement or statements either negligently, or recklessly or intentionally[.]"
>
> c. The amount of $100,000 "would fairly and reasonably compensate Mr. Kanaga for damages caused by [Defendant] in defaming him[.]"[7]

In addition, the jury answered the following "additional advisory factual questions for the benefit

of the court":

> Do you find by clear and convincing evidence that [Defendant] published one or more of the following statements either knowing that they were false or in reckless disregard as to whether each statement was false:
>
> [1]      Mr. Kanaga attempted to pay off [Defendant]'s own lawyers;
> [2]      Mr. Kanaga attempted to pay off judges; and
> [3]      Mr. Kanaga attempted to pay off members of law enforcement, including a police officer from Cohasset.[8]

---

[6] Kanaga suggests that he "proved" to the Barnstable Court jury that Defendant made other defamatory remarks, but he has not presented any evidence that those statements played a role in the jury's deliberation. *See, e.g.,* PreTrial Order 7 ¶ II(5), ECF No. 105.

[7] Pls.' Ex. 2-1 to -2.

[8] Pls.' Ex. 2-3.

The jury answered each question in the affirmative.[9] On February 21, 2019, the Barnstable Court entered judgment for Kanaga in the amount of $144,064.90, which included the jury's assessment of damages, court costs, and pre-judgment interest (the "Defamation Judgment").[10]  Kanaga seeks to have this debt excepted from discharge in Defendant's underlying bankruptcy case pursuant to § 523(a)(6), alleging that Defendant willfully and maliciously intended to cause the damages awarded by the Barnstable Court jury.

The Defamation Judgment establishes several objective facts, which this Court must accept as true:[11]

1.      Defendant made false statements concerning Kanaga;

2.      the false statements made by Defendant were defamatory;

3.      the false statements caused damages of $100,000 to Kanaga;

4.      Defendant published the false and defamatory statements "either negligently, or recklessly or intentionally"[12]; and

5.      Defendant published each of the false and defamatory statements *either* knowing that it was false *or* in reckless disregard as to whether the statement was false.[13]

---

[9] *Id.*

[10] Pls.' Ex. 3.

[11] For a discussion of the collateral estoppel effect of the Defamation Judgment, see *Landon I*, 2020 WL 4658284, at *5-8.

[12] Pls.' Ex. 2-1 to -2.  This finding appears to be made under the "preponderance of the evidence" standard.  *Id.* at 2-1.

[13] Pls.' Ex. 2-3.

The Barnstable Court jury found the last fact, regarding Defendant's state of mind, was established by clear and convincing evidence.[14] Because the jury verdict included states of mind in the disjunctive (i.e., it included both *knowing* and *reckless disregard*), this Court found in *Landon I* that the Defamation Judgment did not conclusively establish Defendant acted willfully and maliciously under § 523(a)(6).[15] Those issues are now the subject of the present proceeding.

From the perspective of Kanaga, this is an open and shut case. The defamatory remarks about Kanaga in the Defamatory Post were not written in a vacuum. The Defamatory Post was a long and meandering screed, of which the statements referring to Kanaga were just a small part.[16] The larger post focused on an unnamed "cult," the escape of Defendant's husband, David Manuel

---

[14] *Id.* The burden of proof needed to establish an intentional tort (e.g., preponderance of evidence, clear and convincing evidence) is a separate concept from the mental state of the tortfeasor (e.g., negligent, reckless, knowing, purposeful) that must be proven to establish a creditor's damages or an exception from a bankruptcy discharge. As noted in *Landon I*, 2020 WL 4658284, at *8, if a jury's verdict does not establish that its awarded damages were the result of a "willful and malicious injury," then the burden of proof applied is irrelevant for the purposes of collateral estoppel.

[15] *Landon I*, 2020 WL 4658284, at *7–8. *See also Stewart v. Kauanui (In re Kauanui)*, No. 14-00077, 2015 WL 359088, at *3 (Bankr. D. Haw. Jan. 23, 2015) ("A claim for defamation *could* support a determination of nondischargeability, but *only if the plaintiff proved willful and malicious conduct.* A California judgment for defamation, *without additional specific findings*, does not establish that the defendant acted willfully and maliciously under section 523(a)(6)." (emphasis added) (footnote omitted)); *Mahadevan v. Bikkina (In re Mahadevan)*, 617 F. Supp. 3d 654, 664–65 (S.D. Tex. 2022) (same); *Dang v. Gilbert (In re Dang)*, 560 B.R. 287, 293 (S.D. Tex. 2016) ("Disjunctive jury instructions in state-court judgments make it difficult for a bankruptcy court to give preclusive effect to that judgment in deciding whether the judgment debt is nondischargeable."); *Jenkins v. IBD, Inc.*, 489 B.R. 587, 601–02 (D. Kan. 2013) ("Numerous courts have refused to apply collateral estoppel to a state-court judgment based upon a disjunctive jury instruction including one or more alternatives that deviate from the standards required under Section 523(a)(6). In this situation, the disjunctive language of jury instructions or state-court judgments is not trivial; it 'is fatally problematic.'" (citing cases)).

[16] Pls.' Ex. 5.

5

("Manuel"), from the so-called cult, and the cult's continued pursuit of Defendant's inheritance from Manuel's probate estate. In both the Barnstable Court litigation and here, Defendant denies writing the Defamatory Post, but, as discussed in *Landon I* and *supra*, this Court is bound by the jury's factual finding that she did so.[17]   Acknowledging this factual hurdle, Defendant insists the Defamatory Post was made as a private message to a limited audience of her 514 "friends" on Facebook.  In an additional effort to separate herself from responsibility for the Defamatory Post, Defendant testified she was ill and under mild sedation at the time it was made.

At trial, Kanaga introduced testimony and documentary evidence showing that the Defamatory Post was just the tip of the iceberg.  Defendant has engaged in a long and vexatious campaign against Kanaga and a church referred to as the Community of Jesus ("COJ"), of which Kanaga is a member and sometimes legal counsel.  For example, Defendant filed a petition for protective order against Kanaga in the District Court of Tulsa County, Oklahoma, which accused him of stalking, mail fraud, death threats, car chasing, and theft, among other things.[18] Defendant also sent abusive faxes to the attention of the Barnstable Court alleging that she was not properly served, then further accusing Kanaga of "heisting," embezzlement, malicious prosecution, frivolous harassment, chasing, and physical endangerment.[19] In pleadings and faxes to various courts, she asserted her belief that the COJ, led by Kananga, would try to harm her physically ("I believe [Kanaga] or his thugs will try to kill me."),[20] financially ("It's cult lawyer is abusing

---

[17] *See supra* note 11.

[18] Pls.' Exs. 10–12.

[19] Pls.' Exs. 8–9.

[20] Pls.' Ex. 10-4.

[Defendant] to snatch funds prematurely from the Trust BEFORE Death Costs are paid to widow[.]"), [21] or a combination of both ("KILL THE WIDOW, STEAL THE LARGE INHERITANCE.").[22] Among the debts scheduled by creditors in Defendant's bankruptcy case, at least 4 were based on sanctions issued against Defendant for improper litigation conduct.[23]

    As evidence of Defendant's state of mind near the time of the Defamatory Post, Kanaga also offered emails sent by Defendant to her own lawyers,[24] and a civil suit she filed in the United States District Court for the Northern District of Oklahoma against a client of Kanaga, among others, related to Manuel's probate estate.[25]   The correspondence included long, often unintelligible rants similar in spirit to the Defamatory Post.  The purpose of the evidentiary offer was to show Defendant's general contempt for Kanaga, and to show Defendant is a proto-typical out-of-control litigant, who strains the credulity and patience of anyone that crosses her.

    Kanaga emphasizes that Defendant's testimony exhibited a general lack of credibility and veracity.  On this point, he is not wrong.  When questioned about the status of the various court proceedings involving Manuel's probate estate, not only did Defendant fail to accurately describe

---

[21] Pls. Ex. 14-1.

[22] Pls.' Ex. 12-1.

[23] *See Landon I*, 2020 WL 4658284, at *2-4 (Kanaga); *Ford v. Landon (In re Landon)*, 619 B.R. 727 (Bankr. N.D. Okla. 2020) (Robbins); *Id.*, Ch. 7 Case No. 19-11005-M, Adv. No. 19-01039, 2020 WL 4668270 (Bankr. N.D. Okla. Aug. 11, 2020), ECF No. 48 (Ford); *Id.*, 2020 WL 4668282 (Bankr. N.D. Okla. Aug. 11, 2020), ECF No. 51 (Tingley).  This Court previously found Kanaga's judgment for sanctions issued by the District Court in and for Tulsa County, State of Oklahoma, was not excepted from discharge under § 523(a)(6).  *Landon I*, 2020 WL 4658284, at *8-10.

[24] Pls.' Ex. 4.

[25] Pls.' Ex. 14.

their current status, but she spun a fantastical yarn about each one that resulted in her winning the lot.  In contrast, Kanaga offered a court record of each proceeding showing it had been dismissed or resolved in Kanaga's favor.[26]  That exercise was emblematic of how Defendant appears to process negative information:  she spins it in her mind into a positive event, and then vigorously attacks anyone that does not share her vision.  Suffice it to say, there was a significant gulf between Defendant's testimony and what the rest of us would consider "verifiable facts."

In contrast, Defendant's version of this tale depicts her as the victim of a dark, sinister plot by the COJ, led by Kanaga, to deprive her of her rightful inheritance from Manuel's probate estate by any means necessary, including physical harm.  Prior to 2005, Manuel had been a member of the COJ and a personal friend of Kanaga.  After a tumultuous relationship with the COJ, Manuel left the organization and married Defendant in 2009. Both before and during her marriage to Manuel, Defendant was exposed to and indoctrinated with the details of Manuel's ordeals and schism with the COJ.  Manuel related personal accounts to Defendant of abuse of himself and others at the hands of members of the COJ. Toward the end of his life, when Manuel was ill with cancer, he warned Defendant that Kanaga and the COJ would attempt to prevent her from receiving any inheritance from his estate.  According to Defendant, Manuel painted a menacing and prophetic portrait of the treatment Defendant should expect from the COJ after his death.

In some important ways, Manuel's predictions were borne out. After Manuel's death, his daughter, Blair Tingley, represented by Kanaga and his law firm, challenged Defendant's status as Manuel's rightful spouse and heir, challenged the validity of the will submitted by Defendant to the probate court, and eventually succeeded in having Defendant removed as personal

---

[26] *See* Pls.' Exs. 16, 18, 20–21.

representative of Manuel's probate estate.  Defendant was initially represented in the probate litigation by a law firm, Rubin and Rudman ("Rubin"), that she came to believe was doing Kanaga's bidding.  Her belief is supported by the fact she was referred to Rubin by someone affiliated with the COJ, she felt Rubin withheld vital information from her during key hearings in the probate litigation, and (she believes) Kanaga authorized a payment to Rubin after the firm unceremoniously withdrew from her representation at a crucial juncture in the probate proceedings. The Court does not, and need not, determine that any of the preceding facts about Kanaga or Rubin are true; it need only, and does, find that *Defendant is convinced* that Kanaga effectively bribed and/or paid off her attorneys in order to sabotage her standing in the probate litigation.

Defendant recounted several episodes occurring both before and after Manuel's death that she considers direct threats from the COJ and Kanaga.  She testified that her computers, phones, and other electronic devices were being "hacked" and "tapped," resulting (she believes) in the COJ getting access to sensitive documents and passwords. She testified to being "chased" by a dark SUV in both Massachusetts and Oklahoma, and she is convinced these were members of the COJ attempting to harm her.  She also spun fanciful stories of threatening incidents, involving such things as severed heads and pitchforks, that were quite hard to follow.  It is important to note that Defendant could point to *no evidence* that linked any of these events to the COJ or Kanaga. Nevertheless, *Defendant firmly believes* that Kanaga and the COJ were responsible for each of these incidents as part of an elaborate and sophisticated campaign of abuse and harassment against her.

To bolster her statements regarding her fear of harm and reprisal from the COJ and Kanaga, Defendant introduced the testimony of several witnesses who were acquainted with both her and Manuel before his death, and who had witnessed some of the episodes recounted above.  Ms. Elva

9

Hope testified that she saw evidence of a break-in at Defendant's home and items displayed that she and Defendant interpreted as death threats.  Ms. Hope did not indicate when this event occurred or any other details about who may have been responsible. She testified that during a prayer meeting a "man they didn't know" had let himself into the house, who was subsequently escorted outside.  She could offer no evidence regarding the man's identity, actions, or purpose, except that she "heard that it was Kanaga."[27]  Lastly, Ms. Hope testified that she was once in a vehicle with Defendant in Defendant's driveway when a car with darkly tinted windows pulled in front of their car, blocking their exit.  She stated the car immediately backed up and did not otherwise engage them.  Ms. Hope did not indicate when the incident occurred or any details about the car or driver, except to note that *Defendant was convinced* they had made a narrow escape from Kanaga and his associates.  Although Ms. Hope's testimony did nothing to indicate Kanaga was responsible for any of the described events, it does reinforce that Defendant had a real and vivid paranoia regarding Kanaga and the COJ.

Ms. Connie Wilson testified that, before his death, Manuel told her about his negative experiences with the COJ. She also testified that Defendant had confided in her about Defendant's fears and concerns about the COJ.  Ms. Wilson stated that "at least two or three times" she personally witnessed a mouse icon moving around on Defendant's computer that appeared to be controlled remotely, which Defendant believed was evidence that members of the COJ were hacking into her computer. Ms. Wilson attended a court hearing regarding Manuel's probate estate at which she believed counsel for Blair Tingley used deception to convince the court to appoint a special representative for Manuel's estate.  Although Ms. Wilson stated Kanaga did not personally

---

[27] *See* Trial Tr. Vol. 1, 189:7, ECF No. 119.

make any statements before the court, his appearance at the hearing led her to believe that Kanaga had orchestrated the event.  Lastly, Ms. Wilson testified she had been on the telephone with Defendant during an episode when a police officer confronted Defendant in the parking lot of a donut shop in Cohasset, Massachusetts.  Defendant felt threatened and felt that she was being warned to leave town by the officer at the behest of the COJ.

Mr. Andrew Hale-Byrne testified by deposition regarding his relationship and encounters with Manuel and Defendant.  Mr. Hale-Byrne had attended a school that he believed was associated with the COJ, and was later involved in a class action lawsuit in Canada against the school.  He became familiar with Manuel as an author and as a contributor to an online chat group of persons discussing their experiences with the COJ.  Mr. Hale-Byrne testified that on at least one occasion he and Manuel, in the presence of Defendant, discussed the details of Manuel's encounters with Kanaga and the COJ.  He stated that Defendant was present when Manuel, in a very emotional conversation, referred to Kanaga as 1) the leader of the COJ; 2) someone who caused Manuel harm; and 3) a thug.  He also testified that, in the presence of Defendant, Manuel described the COJ as 1) an organized crime outfit; 2) in the habit of bribing judges and lawyers; and 3) embedded in local municipal offices, the FBI, and the courts.  While the veracity of Manuel's allegations is not relevant to this proceeding, the Court accepts Mr. Hale-Byrne's testimony as an accurate account of the atmosphere created by Manuel and his influence on Defendant's understanding and beliefs about Kanaga and the COJ at the time she made the Defamatory Post.

Although Defendant frequently proved to be a difficult litigant in this proceeding, the evidence and testimony made one fact clear: she had a sincere and palpable fear of the COJ and Kanaga. On those points, she never wavered.  For each of the statements regarding Kanaga

11

included in the Defamatory Post, which the Barnstable Court jury found to be false, Defendant testified credibly why *she believed they were true.*  Her belief that her attorneys at Rubin were paid under Kanaga's authority shortly after withdrawing from her representation supports Defendant's belief that Kanaga "attempted to pay off [Defendant]'s own lawyers."  Defendant's conversations with Manuel and Mr. Hale-Byrne support her belief, however misguided, that Kanaga "attempted to pay off judges" as a regular litigation practice.  And lastly, her personal experience of being pulled out of line at a coffee shop and being told to leave town by a police officer in Cohasset, Massachusetts, supports her belief that Kanaga had "attempted to pay off members of law enforcement, including a police officer from Cohasset."  The testimony of Ms. Hope, Ms. Wilson, and Mr. Hale-Byrne provided additional context and support for Defendant's perspective.  The Court does not find that any of Defendant's beliefs were reasonable—only that she subjectively held them.  Despite Defendant's generally untrustworthy demeanor, the Court found her to be sincere and credible with respect to her fear of and distress regarding Kanaga.

To the extent the "Conclusions of Law" contain any items that should more appropriately be considered "Findings of Fact," they are incorporated herein by this reference.

### Conclusions of Law

Kanaga bases his claim of non-dischargeability on § 523(a)(6) of the Bankruptcy Code, which provides:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b) or 1328(b) of this title does not discharge an individual debtor from any debt —
> . . . .
> (6)  for willful and malicious injury by the debtor to another entity or the property of another entity.[28]

---

[28]  § 523(a)(6).

Since this Court issued its opinion in *Landon I*, the United States Bankruptcy Appellate Panel of

the Tenth Circuit has issued guidance on the interpretation of § 523(a)(6) as follows:

> [P]roof of a "willful and malicious injury" under § 523(a)(6) requires proof of two
> distinct elements — the injury must be both "willful" *and* "malicious."
>
> . . . .
>
> For an injury to be "willful," there must be a deliberate or intentional injury,
> not merely "a deliberate or intentional act that leads to injury." "[T]he (a)(6)
> formulation triggers in the lawyer's mind the category 'intentional torts,' as
> distinguished from negligent or reckless torts. Intentional torts generally require
> that the actor intend 'the *consequences* of an act,' not simply the act itself." A
> willful injury may be established by direct evidence that the debtor acted with the
> specific intent to harm a creditor or the creditor's property, or by indirect evidence
> that the debtor desired to cause the injury or believed the injury was substantially
> certain to occur. This is a subjective standard.
>
> . . . .
>
> For an injury to be "malicious," "evidence of the debtor's motives, including
> any claimed justification or excuse, must be examined to determine whether the
> requisite 'malice' in addition to 'willfulness' is present." "[A]ll the surrounding
> circumstances, including any justification or excuse offered by the debtor, are
> relevant to determine whether the debtor acted with a culpable state of mind vis-a-
> vis the actual injury caused the creditor." A willful and malicious injury requires
> more than negligence or recklessness. Six circuit courts have defined the "malicious"
> element to require an act taken in conscious disregard of one's duties and without
> just cause or excuse, even in the absence of personal hatred, spite or ill-will, or
> wrongful and without just cause or excuse. These definitions are similar to the pre-
> *Geiger* definition of "malicious" adopted by the Tenth Circuit in *In re Pasek*. . . .
> For an injury to be "malicious," therefore, the debtor's actions must be wrongful.[29]

---

[29] *First Am. Title Ins. Co. v. Smith (In re Smith)*, 618 B.R. 901, 912, 919 (10th Cir. BAP 2020) (footnotes omitted) (first citing *Kawaauhau v. Geiger*, 523 U.S. 57 (1998); and then *Dorr, Bentley & Pecha, CPA's, P.C. v. Pasek (In re Pasek)*, 983 F.2d 1524 (10th Cir. 1993)) (adopting separate standards for "willful" and "malicious" under § 523(a)(6)). *See also Glencove Holdings, LLC v. Bloom (In re Bloom),* No. 22-1005, 2022 WL 2679049, at *7 (10th Cir. July 12, 2022) (unpublished) (adopting analysis of *In re Smith*); *Swan Pediatric Dental, LLC v. Hulse (In re Hulse)*, No. UT-22-001, 2022 WL 16826561, at *7–8 (10th Cir. BAP Nov. 8, 2022) (citing *In re Smith*).

This statement affirms the Court's conclusion in *Landon I* that willfulness and maliciousness must be analyzed as separate prongs under § 523(a)(6), and provides additional guidance on how to do so.[30]

Following *Kawaauhau v. Geiger*,[31] in order for conduct to be willful under § 523(a)(6), "the debtor must desire . . . [to cause] the consequences of his act or . . . believe [that] the consequences are substantially certain to result from it."[32]   In the Tenth Circuit, "malicious intent [may] be demonstrated by evidence that the debtor had knowledge of the creditor's rights and that, with that knowledge, proceeded to take action in violation of those rights."[33]   "[P]ersonal animus is not a requirement for malicious injury."[34]   For an injury to be malicious, the debtor must be

---

[30] *Landon I*, 2020 WL 4658284, at *4.

[31] 523 U.S. 57, 61–62 (1998).

[32] *Panalis v. Moore (In re Moore)*, 357 F.3d 1125, 1129 (10th Cir. 2004) (quoting *Mitsubishi Motors Credit of Am., Inc. v. Longley (In re Longley)*, 235 B.R. 651, 657 (10th Cir. BAP 1999)).

[33] *In re Pasek*, 983 F.2d at 1527 (internal quotation marks and citation omitted).  *See also In re Bloom*, 2022 WL 2679049, at *7 ("To be malicious, the debtor must have 'acted with a culpable state of mind vis-à-vis the actual injury caused the creditor.'" (quoting *In re Smith*, 618 B.R. at 919)); *Wheeler v. Laudani*, 783 F.2d 610, 615 (6th Cir. 1986) ("'Malicious' means in conscious disregard of one's duties or without just cause or excuse; it does not require ill-will or specific intent to do harm."); *In re Thirtyacre*, 36 F.3d 697, 700 (7th Cir. 1994) (citing *Wheeler*).

[34] *In re Bloom*, 2022 WL 2679049, at *7 (citing *In re Smith*, 618 B.R. at 919). *See also Murphy v. Snyder (In re Snyder)*, 939 F.3d 92, 105 (2nd Cir. 2019) ("In addition, '[t]he injury caused by the debtor must also be malicious, meaning 'wrongful and without just cause or excuse, even in the absence of personal hatred, spite, or ill-will.'" (citing *Ball v. A.O. Smith Corp.*, 451 F.3d 66, 69 (2d Cir. 2006))); *Kane v. Stewart Tilghman Fox & Bianchi Pa (In re Kane)*, 755 F.3d 1285, 1294 (11th Cir. 2014) ("Malicious means wrongful and without just cause or excessive even in the absence of personal hatred, spite or ill-will." (internal quotation marks and citation omitted)); *Old Republic Nat'l Title Ins. Co. v. Levasseur (In re Levasseur)*, 737 F.3d 814, 818 (1st Cir. 2013) ("An injury is malicious if it was wrongful and without just cause or excuse, even in the absence of personal hatred, spite or ill-will." (internal quotation marks and citation omitted)); *In re*

*conscious* that their actions are wrong.[35] "Libel and defamation claims are nondischargeable under § 523(a)(6) when the statements were made with *actual knowledge of their falsity*."[36] Therefore, defamation can constitute a "willful and malicious injury" where a debtor *knew* (or was substantially certain) that the *published statements were false*.[37] "Mere reckless disregard for the truth or falsity of the statement, which can support a libel verdict, is not a willful and malicious

---

*Thirtyacre*, 36 F.3d at 700 (same); *Wheeler*, 783 F.2d at 615 (same); *Materia v. Pereira (In re Pereira),* 44 B.R. 248, 251 (Bankr. D. Mass. 1984).

[35] *In re Bloom*, 2022 WL 2679049, at *7 (citing *In re Smith*, 618 B.R. at 919); *In re Levasseur*, 737 F.3d at 818 ("The injury must have been committed in 'conscious disregard of one's duties.'"); *ABF, Inc. v. Russell (In re Russell)*, 262 B.R. 449, 455 (Bankr. N.D. Ind. 2001) ("[A] debtor's actions are not automatically labeled malicious simply because they are wrongful. There must also be a consciousness of wrongdoing. It is this knowledge of wrongdoing, not the wrongfulness of the debtor's actions, that is the key to malicious under § 523(a)(6). Without it there can be no 'conscious disregard of one's duties,' only an unconscious one." (citations omitted)).

[36] *Marshall v. Marshall (In re Marshall)*, 264 B.R. 609, 630 (C.D. Cal. 2001) (citing *Wheeler,* 783 F.2d at 615) (emphasis added).

[37] *Id.*; *In re Mahadevan*, 617 F. Supp. 3d at 664; *Irvin v. Faller (In re Faller)*, 547 B.R. 766, 772 (Bankr. W.D. Ky. 2016) ("A debtor does not act in '*conscious* disregard of [his] duties,' *Thirtyacre,* 36 F.3d at 700, in making a defamatory statement that he may actually believe is true." (emphasis added by *In re Faller*)); *In re Russell*, 262 B.R. at 454–55; *Pagones v. Mason (In re Mason)*, No. 95-B-41537, 1999 WL 58579, at *3 (Bankr. S.D.N.Y. Jan. 28, 1999) ("The intentional tort of defamation may constitute 'willful and malicious injury' by the debtor to another entity under § 523(a)(6) of the Bankruptcy Code, as long as the debtor knew the published statements were false."); *Roberts v. Goidel (In re Goidel)*, 150 B.R. 885, 888 (Bankr. S.D.N.Y. 1993) (same); *Thompson v. Durrance (In re Durrance)*, 84 B.R. 238, 239 (Bankr. M.D. Fla. 1988) (same); *In re Pereira*, 44 B.R. at 251 ("The intentional tort of libel may be considered a willful and malicious injury if it can be demonstrated that the libel was committed with the requisite willfulness and malice. Malice in the bankruptcy sense means that the author knew the statements made were false." (citing *Industrie Aeronautiche E. Meccaniche Rinaldo Piaggio S.p.A. v. Kasler (In re Kasler),* 611 F.2d 308 (9th Cir. 1979))).  While some courts analyze a debtor's knowledge of falsity under the malice prong, e.g., *In re Goidel*, 150 B.R. at 888, and others under the willfulness prong, e.g., *Schrader v. Sangha (In re Sangha)*, 644 B.R. 843, 870-73 (Bankr. C.D. Cal. 2022), they are consistent in holding that knowledge or substantial certainty of falsity is required to support a finding of nondischargeability under § 523(a)(6).

injury for purposes of § 523(a)(6)."[38]  Note that the actual truth of the offending statement is not an available defense to Defendant at this point in the litigation.[39]  That ship metaphorically sailed upon the entry of the Defamation Judgment, where the jury found the statements to be false. At this juncture, the Court is only concerned with *what the Defendant knew* at the time she wrote the Defamatory Post.

A court's determination under § 523(a)(6) requires a subjective assessment of the debtor's knowledge and motives, including any claimed justification or excuse.[40]  "The subjective standard correctly focuses on the debtor's state of mind and precludes application of § 523(a)(6)'s nondischargeability provision short of the debtor's actual knowledge that harm to the creditor was substantially certain."[41]  In conducting such an inquiry, a court is not limited to self-serving

_____

[38] *Wheeler*, 783 F.2d at 615; *In re Goidel*, 150 B.R. at 888; *In re Durrance*, 84 B.R. at 239 ("Clearly, reckless acts are insufficient to satisfy § 523(a)(6)."); *Martell v. Voltolini (In re Voltolini)*, 48 B.R. 199, 201 (Bankr. D. Mass. 1985) ("Injury committed in reckless disregard of a person's rights does not rise to the level of willful and malicious injury."); *In re Pereira*, 44 B.R. at 251 ("Reckless disregard for the truth or falsity of a statement does not meet the standard of willful and malicious injury.").

[39] *See, e.g., In re Sangha*, 644 B.R. at 872 (applying collateral estoppel to a state court judgment and concluding that the actual truth of the statements was not a defense available to debtor).

[40] *In re Pasek*, 983 F.2d at 1527; *Carrillo v. Su (In re Su)*, 290 F.3d 1140, 1146 (9th Cir. 2002); *First Nat'l Bank of Md. v. Stanley (In re Stanley)*, 66 F.3d 664, 668 (4th Cir. 1995) ("[I]t is the debtor's subjective state of mind that is relevant; it does not matter that a 'reasonable debtor' should have known that his act would adversely affect another's rights."); *In re Smith*, 618 B.R. at 919; *Baner v. Charles (In re Charles)*, No. 17-12568, 2023 WL 3066684, at *8 (Bankr. D. Nev. Apr. 24, 2023) ("Section 523(a)(6)'s willful injury requirement is met 'only when the debtor has a subjective motive to inflict injury or when the debtor believes that injury is substantially certain to result from his own conduct.'" (quoting *In re Su*, 290 F.3d at 1142)). *See also Counterman v. Colorado*, 600 U.S. 66, 78 (2023) (adopting a subjective element in a true-threat case, noting this is consistent with its other unprotected-speech cases, including defamation).

[41] *In re Su*, 290 F.3d at 1146. *See also In re Charles*, 2023 WL 3066684, at *11 ("[E]ven substantial certainty of injury under § 523(a)(6) remains dependent upon the debtor's subjective

statements from the debtor; "[i]n addition to what a debtor may admit to knowing, the bankruptcy court may consider circumstantial evidence that tends to establish what the debtor must have actually known when taking the injury-producing action."[42]  "A totality of the circumstances inquiry is fact specific and hinges on the credibility of witnesses."[43]

The United States Supreme Court, in *Counterman v. Colorado*,[44] recently offered a primer on the various mental states used to evaluate the subjective mindset required to trigger a speaker's culpability for their actions in a criminal context:

> The law of *mens rea* offers three basic choices. Purpose is the most culpable level in the standard mental-state hierarchy, and the hardest to prove. A person acts purposefully when he "consciously desires" a result—so here, when he wants his words to be received as threats. *United States v. Bailey*, 444 U.S. 394, 404, 100 S.Ct. 624, 62 L.Ed.2d 575 (1980). Next down, though not often distinguished from purpose, is knowledge. *Ibid.* A person acts knowingly when "he is aware that [a] result is practically certain to follow"—so here, when he knows to a practical certainty that others will take his words as threats. *Ibid.* (internal quotation marks omitted). A greater gap separates those two from recklessness. A person acts recklessly, in the most common formulation, when he "consciously disregard[s] a substantial [and unjustifiable] risk that the conduct will cause harm to another." *Voisine v. United States*, 579 U.S. 686, 691, 136 S.Ct. 2272, 195 L.Ed.2d 736 (2016) (internal quotation marks omitted). That standard involves insufficient concern with risk, rather than awareness of impending harm. See *Borden* v. *United States*, 593 U. S. ——, ——, 141 S.Ct. 1817, 1823–1824, 210 L.Ed.2d 63 (2021) (plurality opinion). But still, recklessness is morally culpable conduct, involving a

---

belief. In *Su*, the Ninth Circuit rejected the objective application of substantial certainty of harm to prove willfulness under § 523(a)(6).").

[42] *In re Su*, 290 F.3d at 1146 n.6.  *See also Tobias v. Alvarado (In re Alvarado)*, 608 B.R. 877, 885 (Bankr. W.D. Okla. 2019) ("Because fraudulent intent is rarely admitted by a debtor, courts uniformly recognize it may be established by circumstantial evidence or by inferences drawn from a course of conduct or from the totality of the circumstances." (citations omitted)).

[43] *Graham v. Graham (In re Graham)*, 600 B.R. 90, 95-96 (Bankr. D. Kan. 2019).

[44] 600 U.S. 66 (2023).

"deliberate decision to endanger another." *Voisine*, 579 U.S. at 694, 136 S.Ct. 2272.[45]

This inquiry is meant to balance a speaker's right of protected speech under the First Amendment, while discouraging unprotected speech, such as defamation.[46]  Using *Counterman* as a guide, the question before the Court is: did Defendant *know* or was she *substantially certain* that the statements in the Defamatory Post were false (willful), such that injury to Kanaga was *desired* or *practically certain to occur* (malicious)?[47]

    *1.  Willfulness*

At the outset, we must define the nature of the injury suffered by Kanaga.  "In defamation cases, the true injury is not the damage to the creditor's reputation; it is the publication of falsehoods about the creditor that led to the damaged reputation."[48] This principle is rooted in "the individual's right to the protection of his own good name."[49]  The Barnstable Court jury found Kanaga's injury, for which it awarded compensatory damages, to be the *intentional or reckless*

---

[45] *Id.* at 78-79.

[46] *Id*.

[47] *In re Smith*, 618 B.R. at 912, 919; *In re Moore*, 357 F.3d at 1129.  *See also Calumet v. Whiters (In re Whiters)*, 337 B.R. 326, 349 (Bankr. N.D. Ind. 2006) ("It is not the specific injury which occurred which is the focus; rather, it is the intent to cause an injury or to intentionally act in a manner which *the debtor knows* should cause injury—again with the intent to affect the person or property interest of another—that counts.").

[48] *In re Russell*, 262 B.R. at 454. *See also In re Whiters*, 337 B.R. at 348.

[49] *Gertz*, 418 U.S. at 341.  *See also Rosenblatt v. Baer*, 383 U.S. 75, 92 (1966) (Stewart, J. concurring) ("The right of a man to the protection of his own reputation from unjustified invasion and wrongful hurt reflects no more than our basic concept of the essential dignity and worth of every human being—a concept at the root of any decent system of ordered liberty.").

publication of false and defamatory statements by Defendant.[50]  Damage to Kanaga's reputation or standing in the community is a by-product of the publication of false statements, but it is not the injury itself.  Therefore, in the Court's discussion of willfulness, the question is whether Defendant intended to publish false and defamatory remarks, not whether she intended to harm creditor's reputation.[51]

As noted *supra*, the evidence before the Court overwhelmingly leads to the conclusion that Defendant sincerely believed each and every allegation made about Kanaga in the Defamatory Post.  While the Barnstable Court jury found those statements to be false, Kanaga has provided no evidence that Defendant ever entertained doubts about their veracity.  For example, Kanaga presented no evidence that Defendant was exposed to persons or information that challenged her beliefs or introduced legitimate doubts about Kanaga and the COJ.  To the contrary, the evidence presented was that all voices and resources available to Defendant only reinforced her belief in the sinister and dangerous nature of the COJ, and by association, Kanaga.  Each of the documents introduced by Kanaga to show Defendant's vexatious nature only served to reinforce the conclusion that she genuinely feared that Kanaga would inflict both physical and legal harm against her.[52] Under principles of collateral estoppel discussed in *Landon I,* the Court is bound to find that Defendant's statements in the Defamatory Post were *at least* recklessly made, i.e., that

---

[50] Pls.' Ex. 2-3.

[51] *In re Russell,* 262 B.R. at 454–55 ("[T]he proper question is not whether the debtor intended to injure the creditor's reputation, but instead, whether the debtor intended to publish the defamatory remarks."); *In re Whiters*, 337 B.R. at 348 (same).

[52] *See, e.g.,* Pls.' Exs. 4, 8–10, 12, 14.

Defendant "in fact entertained serious doubts as to the truth of [her] publication."[53]  But a reckless disregard of the truth does not satisfy the standard for willful injury under § 523(a)(6).  Kanaga has not established that Defendant knew or was substantially certain that the statements in the Defamatory Post were false, and therefore has not shown Defendant made the false statements willfully under § 523(a)(6).

Kanaga argues that the element of willfulness has been established by a finding of the Barnstable Court that the statements in the Defamatory Post were "defamation per se."[54]  To the extent Kanaga is arguing this Court is collaterally estopped from making a determination regarding willfulness, the Court finds that issue was never properly presented or supported.[55]

---

[53] *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968) (defining reckless disregard for the truth under *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964)); Pls.' Ex. 5; *Landon I*, 2020 WL 4658284, at *7.

[54] Pls.' Written Closing Arg. 4, 10, ECF No. 122; Pls.' Written Closing Arg. Reply, ECF No. 124.

[55] This issue was not raised in the PreTrial Order, ECF No. 105.  Kanaga filed a motion for summary judgment that did not make any reference to "defamation per se." *See* Pls.' Mot. Summ. J., ECF No. 36.  He subsequently filed a reply to that motion in which he indicated the Barnstable Court found Defendant's statements to be defamatory per se. Pls. Reply 4, ECF No. 53. Kanaga attached a court notice to his reply indicating that the Barnstable Court had granted a motion in limine designating the statements as defamatory per se, which noted "After Hearing, Motion's [sic] Allowed for reasons stated in the Motion." *Id.*, ECF No. 53-1. Because Kanaga did not provide a copy of the corresponding motion, the Court is unable to evaluate or understand the nature of the Barnstable Court's ruling, and it is therefore not bound by its holding. *See, e.g.*, Order Supp. Record, ECF No. 52 (noting requirement to provide the entire judgment roll when a court is asked to apply preclusion doctrines to a previous court's judgment). Although Kanaga eventually provided a complete copy of the Barnstable Court judgment roll, this Court is under no obligation to sort through that document, which exceeds 2500 pages, to find a nugget that will support his arguments. *See* J. Roll for Barnstable Mass. Sup. Ct. Civ. Action No. 1572-00335, ECF No. 56.

*Even if* Kanaga had properly presented the underlying documents from the Barnstable Court to support a finding of willfulness, the Court would still have rejected his claim.[56]  Under Massachusetts law, certain types of defamatory statements are actionable without proof of economic loss, and are labeled defamation per se.[57]  These include statements that charge a plaintiff with a crime and statements that may prejudice their profession or business.[58]  Economic harm is presumed by such statements, if they are indeed proved to be false, without any additional evidentiary showing.  When statements are found to be defamatory per se, the intent of the tortfeasor is not a factor.  When faced with a state court finding of defamation per se, a bankruptcy court must still find *subjective knowledge* of falsity by the debtor to meet the threshold of § 523(a)(6). As the U.S. Appeals Court for the Sixth Circuit summarized:

> But the law will sometimes presume that injury results from an act. Such is the case for false statements imputing a lack of chastity, which are defamatory per se. *See In re Kennedy*, 249 F.3d 576, 582–83 (6th Cir. 2001) (applying Michigan law). The law presumes that those statements will injure. *Id.* Thus, **all a creditor needs to prove to except a defamation per se judgment from discharge is that the debtor knew the facts which made his statements actionable: that they were false and published without privilege to a third party.** *See id.*; *cf. Wheeler v. Laudani*, 783 F.2d 610, 615 (6th Cir. 1986) (the debtor must "know[ ] the published statements were false" because "[m]ere reckless disregard for the truth or falsity of the statement, which can support a libel verdict, is not a willful and malicious injury" under § 523(a)(6)). The judgment precludes the debtor from arguing that he thought his words weren't harmful. *See Kennedy*, 249 F.3d at 582–83. Any debtor who makes a **knowingly** false, defamatory per se statement is at least substantially certain that his statement will injure. *Id.* at 583.[59]

---

[56] The Court addresses this issue merely to inform any appellate court that it would, if asked, reject Kanaga's argument on the merits.  The elusive motion ruled on by the Barnstable Court, discussed *supra* at note 55, is found at ECF No. 56-10, at 8-11.

[57] *Kaiser v. Kirchick*,  662 F. Supp. 3d 76, 99 (D. Mass. 2023).

[58] *Id*. (citing *Ravnikar v. Bogojavlensky*, 438 Mass. 627, 630 (2003)).

[59] *Doe v. Boland (In re Boland)*, 946 F.3d 335, 338–39 (6th Cir. 2020).

Were this issue properly raised, the Court would have agreed with the Sixth Circuit's analysis that a state court finding of defamation per se, i.e., presumed injury, is not enough to find willfulness under § 523(a)(6).[60]  Where, as here, a state formulation of defamation per se is focused on a plaintiff's burden of proof of harm and does not address the subjective intent of the tortfeasor, it will not satisfy the elements of § 523(a)(6).

### 2. Maliciousness

A malice inquiry requires an assessment of the debtor's motives, including any claimed justification or excuse.[61]  First, the Court must find the Defendant's actions to be wrongful.[62]  That is satisfied here by the publication of false and defamatory statements, as found by the Barnstable Court jury.[63]  "But wrongful injuries are not malicious unless the Debtor also knew them to be

---

[60] In *In re Boland*, the court dealt with the publication of child pornography.  It found proof the debtor published the pornography, which met the state law standard of defamation per se, was not enough under § 523(a)(6).  The court required an additional finding that the specific debtor understood the published pictures to be pornography.  *Id.* at 339 ("So to convince the bankruptcy court that their judgment was the result of willful and malicious injury, Doe and Roe had to prove only that *Boland knew he was dealing with child pornography*, either when creating his exhibits or using them in court—in particular, that *he knew* the images of Doe and Roe depicted real minors. The law does the rest." (emphasis added) (citations omitted)).  *See also Schrader v. Sangha (In re Sangha)*, 644 B.R. 843, 870 (Bankr. C.D. Cal. 2022) (citing *Landon I*, 2020 WL 4658284) (reasoning that "knowledge of the falsity of the statements at issue is not an element of the state law cause of action.").

[61] *In re Pasek*, 983 F.2d at 1527; *In re Smith*, 618 B.R. at 919 (citing *In re Pasek*).

[62] *In re Smith*, 618 B.R. at 919 (citing *Murphy v. Snyder (In re Snyder)*, 939 F.3d 92, 105 (2d Cir. 2019)).

[63] *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340 (1974) ("But there is no constitutional value in false statements of fact. Neither the intentional lie nor the careless error materially advances society's interest in 'uninhibited, robust, and wide-open' debate on public issues. They belong to that category of utterances which 'are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.'" (citations omitted)).

false when he made them; otherwise there can be no 'conscious disregard of duty,' as the cases require."[64] In this context, malice means the publication of *knowingly* false statements, such that the author desires or is practically certain to injure their target.

What becomes clear from Defendant's testimony and the documentary evidence introduced in this proceeding is that Defendant *genuinely believed* in the statements she made about Kanaga at the time of the Defamatory Post.  She did not intend to—or even understand that she was—making false or defamatory statements. Defendant felt both she and Manuel had been unfairly targeted by the COJ and Kanaga for years.  She had no reason to disbelieve Manuel's accounts regarding the COJ.[65]  If anything, the Defamatory Post was intended by Defendant to be an exposé and warning to others about the treatment she experienced at the hands of the COJ and Kanaga. Defendant did not believe she could harm Kanaga by stating what she believed to be true.  The Court finds that Kanaga has not met his burden to show Defendant's actions were malicious.

Kanaga asks the Court to consider Defendant's animus and contempt for himself and the COJ as reasons to find her actions willful and malicious.  He considers this part of the indirect evidence of Defendant's state of mind that the Court must take into account.  Kanaga admits that he was instrumental in removing Defendant as personal representative of Manuel's probate estate, as well as to playing a role in the dismissal of Manuel's probate case in Oklahoma.[66]  Kanaga acknowledges that Defendant was financially devastated as a direct consequence of his actions,

---

[64] *In re Gorchev*, 275 B.R. 154, 170 (Bankr. D. Mass. 2002). *See also* cases cited *supra* notes 34-35.

[65] *St. Amant*, 390 U.S. at 732 ("[R]ecklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.").

[66] *See, e.g.*, Pls.' Written Closing Arg. 5, ECF No. 122.

and as a result, her actions seemed to become more irrational and extreme.[67]  But each of these admissions only *reinforce* the Court's conclusion that Defendant had reason to, *and did in fact*, fear contact with Kanaga and the COJ.  Defendant's motivations for making the statements in the Defamatory Post, to the extent the Court can discern them, were to protect herself, and possibly to warn others of the dangers of engagement with Kanaga and the COJ.  In the absence of evidence that she knew or understood that she was spreading defamatory falsehoods, the Court cannot find that her personal animus is determinative.

Kanaga renews his argument that a finding of "constitutional malice" or "actual malice" by the Barnstable Court jury is sufficient to secure his victory in this case.[68]  The Court considered and rejected this argument in *Landon I*.[69]  The Court explained that the standard under Massachusetts law for those findings include a reckless state of mind in the disjunctive, even if they are proved by clear and convincing evidence.[70]  The Court of Appeals for the Tenth Circuit obliquely addresses this in *In re Pasek*:

> [P]roof of actual knowledge or reasonable foreseeability of injury do not automatically *require* the trier of fact to find "willful and malicious" injury. We recognize that there are no absolutes. In each case, evidence of the debtor's motives, including any claimed justification or excuse, must be examined to determine whether the requisite "malice" in addition to "willfulness" is present. One without the other will not suffice to bar a discharge under § 523(a)(6); all the surrounding circumstances, including any justification or excuse offered by the debtor, are relevant to determine whether the debtor acted with a culpable state of mind vis-a-vis the actual injury caused the creditor.[71]

---

[67] *Id*.

[68] *Id*. at 8-10.

[69] *Landon I*, 2020 WL 4658284, at *8.

[70] *Id*.

[71] *In re Pasek*, 983 F.2d at 1527 (citation omitted).

Kanaga cites several cases where bankruptcy courts apply estoppel principles and adopt a state court jury's verdict as the equivalent of a "willful and malicious" finding.[72]  He ignores that in each of those cases, the bankruptcy court conducted a deep dive into the state court verdict and found the jury's *specific findings* met the standards of § 523(a)(6).  For example, in *Bizub v. Paterson (In re Paterson)*,[73] the court relied on a state court jury finding that "[Debtor] has pursued a *malicious, knowing, intentional* effort to create false impressions about [Creditor]; to manufacture charges against her; to do serious injury. The *motivation is to ruin* [Creditor] and to do so on the basis of false information."[74]  The bankruptcy court found these findings satisfied 1) the required state of mind, i.e., did not include a reckless option in the disjunctive, and 2) the required subjective motivation of the debtor, i.e., did not rely on a reasonable person standard.  The court's close analysis of the underlying state court jury verdict resulted in a proper application of collateral estoppel *in that case*.[75]  As noted in *In re Pasek*, estoppel principles cannot and should not be automatically applied *in every case*.[76]

As the United States Supreme Court has noted, the States have substantial latitude to determine and enforce legal remedies for the publication of defamatory falsehoods that are

---

[72] Pls.' Written Closing Arg. 9, ECF No. 122.

[73] No. 10-35734, 2012 WL 1614775 (Bankr. D. Colo. May 9, 2012).

[74] *Id*. at *6 (emphasis added).

[75] *Id*. at *8 ("It is hard to imagine a better example of a case that demands the application of collateral estoppel. To relitigate the matters thoroughly tried and determined in the State Court Action, *in the face of such carefully considered, detailed and unambiguous findings of fact,* would unnecessarily multiply the cost and vexation of multiple lawsuits, waste judicial resources, and discourage reliance on prior adjudication." (emphasis added)).

[76] *In re Pasek*, 983 F.2d at 1527.

injurious to the reputation of a private individual.[77]  This includes imposing liability on a speaker upon a finding of at least negligence, as occurred in this case.[78]  If a State wants to impose liability based on presumed or punitive damages, it must raise the bar to require a showing of reckless behavior, which also occurred in this case.[79]  But nondischargeability under § 523(a)(6) requires yet another step—to a knowing or purposeful state of mind.[80]  Kanaga has not met this burden. As a result, his debt will be discharged in the Defendant's underlying bankruptcy case.

The Court feels it must emphasize that today's holding should not be taken as an invitation to Defendant to reinstate her campaign against Kanaga or the COJ.  Regardless of her knowledge or understanding of the facts at the time she made the Defamatory Post, a jury has now found her statements to be false.  She can no longer be in subjective denial of this fact.  The Court's decision today gives Defendant a "fresh start."[81]  It hopes she uses it wisely.

A separate judgment consistent with this Memorandum Opinion is entered concurrently herewith.

Dated this 30th day of January, 2024.

BY THE COURT:

TERRENCE L. MICHAEL, CHIEF JUDGE
UNITED STATES BANKRUPTCY COURT

---

[77] *Gertz*, 418 U.S. at 345–46.

[78] *See* Pls.' Ex. 2-2.

[79] *Gertz*. 418 U.S. at 349–50.  *See supra* notes 55–56 and accompanying text.

[80] *Kawaauhau v. Geiger*, 523 U.S. 57, 64 (1998).

[81] *Grogan v. Garner*, 498 U.S. 279, 286–87 (1991) ("[I]n the same breath that we have invoked this 'fresh start' policy, we have been careful to explain that the Act limits the opportunity for a completely unencumbered new beginning to the 'honest but unfortunate debtor.'").